NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRYAN S. PEREZ, | ) | |
| | ) | Supreme Court No. S-16676 |
| Appellant, | ) | |
| | ) | Superior Court No. 1KE-16-00025 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| SALLY O. ALHIWAGE, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1688 – August 10, 2018 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Bryan S. Perez, pro se, Ketchikan, Appellant. Renee J. Sheyko, Alaska Legal Services Corporation, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

Bryan Perez and Sally Alhiwage entered into a property settlement agreement to resolve their divorce case. The settlement required Perez to pay spousal support and to transfer certain GI Bill educational benefits to Alhiwage. The settlement also noted that Alhiwage was now living in New Jersey and required Perez to store Alhiwage's belongings for a reasonable period of time.

---

[*] Entered under Alaska Appellate Rule 214.

In this appeal, Perez argues that the spousal support should have ended a few weeks after the parties settled, when he received approval to transfer his GI Bill benefits. But the superior court correctly concluded that the parties had intended the support to continue until Alhiwage started massage therapy school a few months later. Moreover, the court's decision that Perez must continue to store Alhiwage's belongings until he pays this support was reasonable.

## II.     FACTS AND PROCEEDINGS

### A.     Settlement And Divorce

Perez and Alhiwage married in 2008. They filed a pro se petition for dissolution of marriage in January 2016. Alhiwage later objected to the dissolution, and the matter was converted to a divorce.

Both parties retained counsel, and they reached a settlement on property division, spousal support, and other issues. The attorneys summarized the terms of the settlement agreement at a December 19, 2016 hearing.

As explained at the hearing, a central component of the agreement was that Perez would transfer 17 months of his Post-9/11 GI Bill education benefits to Alhiwage. Perez had earned these benefits through his service in the National Guard. The GI Bill benefits included full tuition and a living stipend, and Alhiwage intended to use them to attend massage therapy school.

Perez's attorney explained, however, that "the [GI Bill] stipend is available only during periods of time that Mr. Perez is not on active duty." He represented that Perez was "currently on active duty" and was anticipated to remain on active duty until June 19, 2017. Thus, Perez's attorney explained, "from now until the June 1 payment, Mr. Perez will continue to pay $1,200 per month [in spousal support] to Ms. Alhiwage." He stated that the parties agreed Alhiwage would waive her claim to back spousal support.

Another component of the agreement was that Perez would store some property for Alhiwage, who was then living in New Jersey. Perez's attorney stated that there were "21 boxes of Ms. Alhiwage's property at [Perez's Ketchikan residence], and [she would] retrieve those at her . . . cost and convenience down the road." Perez would store that property "for a period of time."

The parties later incorporated these terms into a document titled "Final Order and Judgment." The parties signed it, and the superior court entered it as an order on January 6, 2017. In pertinent part, the order provided:

> 9. Household goods. . . . [Perez] agrees to store and protect [Alhiwage's] 21 boxes of personal property for a reasonable period of time.
>
> . . . .
>
> 15. The parties agree to the following educational benefits and spousal support. [Perez] will transfer 17 months of Post 9/11 Bill GI [sic] benefits to [Alhiwage]. . . . [Perez] will make good faith efforts to transfer these benefits to [Alhiwage] as soon as possible who will then use them to obtain education and vocational training . . . . [Perez] will execute all documents required by the VA, by the educational institution [Alhiwage] chooses to attend, or by anybody else to affect [sic] this use by [Alhiwage] of these GI Bill benefits. Upon successful transfer of Post 9/11 GI Bill, [Alhiwage] will have 17 months to use benefits from date of transfer.
>
> 16. The Post 9/11 GI Bill comes with a . . . stipend . . . . Assuming [Alhiwage] remains in the New Jersey area where she currently resides, this benefit is approximately $3400 per month. Nevertheless, [Alhiwage] cannot draw this stipend while [Perez] is on active duty . . . , as he is not [sic] at the time this settlement was put on the record on December 19, 2016.
>
> 17. To that end, [Perez] agrees to continue to pay [Alhiwage] spousal support in the amount of $1200 per

month through the first day of June, 2017 or until the Post 9/11 GI Bill is transferred to [Alhiwage] to which she will be entitled to the approx. $3400 stipend, whichever comes first.

18.     [Perez] agrees to resume payment of spousal support to [Alhiwage] during the period of time she loses her monthly stipend due to his active duty service in the amount of $1000 per month.  This condition begins upon date of transfer of Post 9/11 GI Bill and ends 17 months from that date.

. . . .

20.     [Alhiwage] agrees to waive the $8400 in spousal support arrearage . . . .

Except for the GI Bill benefits and the boxes of Alhiwage's personal property, the order assigned all assets and debts, including cars, boats, real property, and retirement benefits, to Perez.  The order provided that the parties would be divorced effective May 31, 2017.

## B.     Subsequent Disputes

Before the superior court entered the Final Order and Judgment, Perez submitted an application to the Department of Defense to transfer his GI Bill benefits to Alhiwage.  On January 7, 2017, the day after the entry of the Final Order and Judgment, he received notice that he "ha[d] been approved by [his] Service to transfer [his] unused Post-9/11 GI Bill benefits to member(s) of [his] immediate family."  The notice stated that Perez's "family members c[ould] apply to use their transferred benefits with the U.S. Department of Veterans Affairs."  The approval was effective retroactively to December 20, 2016.

Perez sent an email to Alhiwage on January 8 explaining that he had completed the transfer paperwork and that "[t]he transfer happened much faster than anyone expected."  He represented that he was no longer on active duty and that Alhiwage would therefore be eligible to "draw" the stipend immediately. Perez stopped paying spousal support to Alhiwage.

In his January 8 email, Perez also advised Alhiwage to contact him about retrieving the 21 boxes of property that he was storing for her. Alhiwage did not respond, and on January 23 Perez sent her a "[l]etter of notification of abandoned property." This letter stated that in accordance with "landlord tenant law," Alhiwage's "personal belongings w[ould] be disposed of after 12 PM on Feb 17, 2017 if [she did] not remove the property."

On February 1, 2017, Alhiwage filed a "Motion for Enforcement" requesting that the superior court require Perez to pay spousal support and prohibit him from disposing of Alhiwage's personal property. Perez, now proceeding pro se, filed a response arguing that he had transferred his GI Bill benefits to Alhiwage and that the settlement agreement thus did not require him to make any further spousal support payments. Perez also argued that he "had no choice" but to send Alhiwage the notification of abandoned property because she had failed to make timely arrangements concerning the property.

The superior court held a hearing on February 15 and entered an enforcement order on February 23. The order required Perez to "pay $1200 per month in spousal support until Ms. Alhiwage can begin collecting an educational stipend under the GI Bill[,] which will be when she begins school, up through June 2017." The order further provided that "Mr. Perez shall safeguard the personal property of Ms. Alhiwage . . . until [she] can arrange to have those items shipped for up to six months from this date."

Perez persisted in not paying spousal support, and on April 13, 2017, Alhiwage moved for an order requiring Perez to show cause why he should not be held in contempt. The superior court granted the motion and held a show-cause hearing on June 21. At this hearing, Alhiwage testified that she had started attending classes on May 5 and had submitted all of the required GI Bill paperwork, but that she had not yet

received her GI Bill stipend. Perez responded that Alhiwage could have started classes in January 2017 because he had transferred the GI Bill benefits to her in December 2016. He argued: "She's the one that made those decisions, and . . . I should not have to pay for those decisions."

During the hearing the parties also addressed the issue of Alhiwage's personal property, which Perez was still storing. Alhiwage requested that she "have 90 days from the day that Mr. Perez actually pays his [spousal support] debt to move those belongings because her ability to do that has been impacted by his refusal to pay the spousal support."

At the conclusion of the hearing, the superior court declined to hold Perez in contempt. But the court ordered Perez to pay Alhiwage a total of $6,000 in spousal support for January through May 2017. The court found that Alhiwage had acted diligently and reasonably in pursuing her GI Bill benefits, and it explained:

> The parties contemplated at the time of [their] agreement that it was going to take a while [to obtain the GI Bill stipend] whether it was because of Mr. Perez's status or because of the procedures involved . . . . There is some language [in the Final Order and Judgment] about the "transfer" being the effective date [for terminating spousal support], but read as a whole, I think it's pretty clear that [Alhiwage] had to actually avail herself of that opportunity [to use the GI Bill benefits] and have the opportunity to avail herself of that opportunity. She clearly wasn't prepared to do that [before May].

The court moreover ordered that Alhiwage remove her belongings from Perez's residence "within 60 days of whenever" Perez paid her the $6,000 in spousal support he owed her.

On July 3, 2017, Perez filed an "Expedited Motion to Enforce the Agreement that the 17 Months of the Post 9/11 GI Bill Was for the Purpose of

Attendance at Cortiva Institute for Massage Training." Perez argued that Alhiwage had violated the Final Order and Judgment because Alhiwage had not enrolled in the Cortiva Institute, the educational institution purportedly contemplated at the time of the parties' settlement, but had instead enrolled in a different institution. The superior court denied the motion, explaining that the Final Order and Judgment "makes no mention of this particular school" and that "it was never a material term of the agreement that [Alhiwage] attend that school."

Perez appeals the superior court's grant of Alhiwage's Motion for Enforcement, the court's ruling following the show-cause hearing, and the court's denial of his Motion to Enforce.[1] Perez's central contention is that the superior court's post-divorce rulings modified the terms of the Final Order and Judgment incorporating the terms of the parties' settlement agreement.

## III. STANDARDS OF REVIEW

We review for abuse of discretion the superior court's enforcement of a settlement agreement incorporated into a divorce decree.[2] We will find an abuse of discretion if the enforcement was "arbitrary, capricious, [or] manifestly unreasonable" or if it "stem[med] from an improper motive."[3] Whether the court's enforcement action

---

[1]     Perez also appeals various orders denying reconsideration, but he does not argue that the superior court abused its discretion in denying reconsideration. *See Smith v. Groleske*, 196 P.3d 1102, 1105-06 (Alaska 2008). Perez has therefore abandoned his appeal of these rulings. *See Smith v. State, Dep't of Transp. & Pub. Facilities*, 253 P.3d 1233, 1237 (Alaska 2011) ("[F]ailure to argue a point . . . constitutes an abandonment of it." (quoting *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980))).

[2]     *McCarter v. McCarter*, 303 P.3d 509, 512-13 (Alaska 2013).

[3]     *Id.* at 513 (quoting *Morris v. Horn*, 219 P.3d 198, 204 (Alaska 2009)).

constituted an improper modification of the settlement agreement is a question of law which we decide de novo.[4]

Contract principles govern the interpretation of a settlement agreement and the incorporating decree.[5] We generally review the superior court's interpretation de novo.[6] But "[w]here the superior court considers extrinsic evidence in interpreting contract terms, . . . we will review the superior court's factual determinations for clear error and inferences drawn from that extrinsic evidence for support by substantial evidence."[7] "A finding of fact is clearly erroneous if it leaves [us] with a 'definite and firm conviction on the entire record that a mistake has been made.' "[8] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Interpreting The Parties' Settlement As Requiring Perez To Pay Spousal Support Until Alhiwage Could Use The GI Bill Benefits.

Perez claims that the superior court erred when it interpreted the parties' settlement agreement as requiring him to pay spousal support until Alhiwage enrolled

---

[4]     *Id.*

[5]     *Zito v. Zito*, 969 P.2d 1144, 1147 n.4 (Alaska 1998).

[6]     *Thomson v. Thomson*, 394 P.3d 604, 607 (Alaska 2017).

[7]     *Gunn v. Gunn*, 367 P.3d 1146, 1150 (Alaska 2016) (alteration in original) (quoting *Mahan v. Mahan*, 347 P.3d 91, 94 (Alaska 2015)).

[8]     *N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005) (quoting *Dunn v. Dunn*, 952 P.2d 268, 270 (Alaska 1998)).

[9]     *Gunn*, 367 P.3d at 1151 (quoting *Seybert v. Cominco Alaska Expl.*, 182 P.3d 1079, 1089 (Alaska 2008)).

in an educational program and began receiving the GI Bill stipend. He contends that under the "plain English" of paragraph 17 of the Final Order and Judgment, his obligation to pay spousal support terminated when he "transferred" the GI Bill benefits to Alhiwage. In his view, the transfer occurred in December 2016 when he submitted the requisite Department of Defense paperwork — or perhaps in January 2017 when the Department approved the application. Perez contends that the court's contrary interpretation constituted an improper modification of the settlement and order.

Perez's interpretation of paragraph 17 is plausible — especially if paragraph 17 is read in isolation. But a court interpreting a settlement agreement or incorporating order must read the document "as a whole" and take account of "extrinsic evidence surrounding the disputed terms."[10] The context surrounding paragraph 17 strongly suggests a different interpretation — namely, that Perez needed to continue paying spousal support until Alhiwage was reasonably able to receive the GI Bill stipend.

First, the last three sentences of paragraph 15 implicitly equate transferring with "[e]ffect[ing] . . . use by [Alhiwage] of the[] GI Bill benefits" and thus indicate that the transfer would not be effective until Alhiwage could take advantage of the benefits. Moreover, the final sentence of paragraph 15 states that "[u]pon successful transfer of Post 9/11 GI Bill, [Alhiwage] will have 17 months to use benefits from date of transfer." If the "date of transfer" were the date Perez submitted the transfer application or the date the Department of Defense approved the application — or any date other than the date Alhiwage started drawing the GI Bill benefits — then Alhiwage's "17 months to use [the] benefits" would expire before Alhiwage had the opportunity to use the full 17 months transferred to her.

---

[10] *Hartley v. Hartley*, 205 P.3d 342, 347 (Alaska 2009) (quoting *Zito*, 969 P.2d at 1147 n.4).

Paragraph 16 and the introductory phrase "[t]o that end" in paragraph 17 indicate that the purpose of the spousal support payments was to tide Alhiwage over until Perez left active duty and Alhiwage could draw the GI Bill stipend. And paragraph 18 provides that Perez would pay Alhiwage spousal support if she were deprived of the GI Bill stipend due to his resumption of active duty service. These provisions suggest that the purpose of the spousal support payments was to support Alhiwage when she was not receiving the GI Bill stipend. And Perez's counsel stated at the December 19, 2016 hearing that the parties anticipated Perez making six months of spousal support payments before Alhiwage would be able to draw the GI Bill stipend.

Furthermore, the record shows that Alhiwage needed the GI Bill stipend to support herself and was dependent on Perez's spousal support payments until she received the stipend. Alhiwage testified at the show-cause hearing that she had no source of income other than limited support from her overseas family. Alhiwage gave up her claim of past-due spousal support and her claim to any share of the parties' property except for 21 boxes of personal property when she agreed to the parties' settlement. Given these circumstances, it is unlikely that the parties would have agreed to an arrangement that left Alhiwage without support for a period of time.

In context, then, paragraph 17 of the Final Order and Judgment is most naturally construed as requiring Perez to pay spousal support until Alhiwage could receive the GI Bill stipend.[11] This interpretation reflects the "reasonable expectations of

---

[11] Perez notes that the Final Order and Judgment was drafted primarily by Alhiwage's trial attorney, a retired military officer who stated she was familiar with military benefits law. Perez implicitly argues that this attorney would have used language other than "transfer" if she had intended Perez's spousal-support obligation to continue even after the Department of Defense approved his transfer paperwork. But Perez does not justify this point. And we see no reason why the expertise of Alhiwage's
(continued...)

the parties" at the time of their agreement.[12]  We thus find no error in the superior court's interpretation of the spousal support provision in the Final Order and Judgment.[13]

###   B.      The Superior Court Did Not Abuse Its Discretion In Awarding Alhiwage A $6,000 Judgment Against Perez.

Perez claims the superior court erred when, following the show-cause hearing, it ordered him to pay $6,000 — an amount representing the unpaid spousal support from January through May 2017.  Perez argues that he should not have to pay this amount because:  (1) Alhiwage could have started classes in January or March 2017; (2) Alhiwage received a GI Bill stipend for May 2017, so Perez should not have to pay for that month; and (3) Alhiwage voluntarily "declined" spousal support after March 2017.  Perez fails to show that the superior court abused its discretion.

---

[11]      (...continued)
attorney would warrant construing the Final Order and Judgment against Alhiwage under the circumstances of this case.  *Cf. Hussein-Scott v. Scott*, 298 P.3d 179, 183 (Alaska 2013) (noting that we disfavor the rule that language should be "construe[d] . . . against its drafter . . . in interpreting marriage settlement agreements").

[12]      *Thomson v. Thomson*, 394 P.3d 604, 607 (Alaska 2017) (quoting *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[13]      Perez briefly challenges language in the superior court's February 23, 2017 order requiring Perez to "pay $1200 per month in spousal support . . . through June 2017."  He contends that this language contradicts paragraph 17 of the Final Order and Judgment, which required him to pay "$1200 per month *through the first day* of June, 2017."  (Emphasis added.)  Perez concedes that this issue is moot.  Because Alhiwage began classes in May 2017, the issue whether the spousal support obligation would have terminated on June 1 or run through June if Alhiwage had *not* started classes is of no practical consequence to the parties.  *See Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 535 (Alaska 2005) ("A claim is moot if it has lost its character as a present, live controversy." (quoting *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1195 (Alaska 1995))).  We therefore do not address this argument.  *See id.*

Perez's first argument fails because the Final Order and Judgment did not impose a duty on Alhiwage to begin taking classes in January or March 2017. The record is not even clear as to whether there was a program that Alhiwage could have started immediately in January. Perez represented at the February 15, 2017 hearing that there was a program that started the week the court entered the Final Order and Judgment, and he asserted that he encouraged Alhiwage to enter this program. But he admitted that the classes had already started and that Alhiwage would have had to "catch up." Another program started in March, but it did not meet Alhiwage's needs: It was part-time and thus would have left her with a much smaller GI Bill stipend than the $3,400 contemplated in paragraph 16 of the Final Order and Judgment. The superior court did not clearly err in finding that Alhiwage had acted diligently and reasonably in pursuing her GI Bill benefits when she enrolled in a program that started in May 2017.

The second argument — that Perez should not have to pay spousal support for May 2017 because Alhiwage started classes that month — fails because, as explained above, the parties contemplated when they reached their settlement that Alhiwage would receive spousal support from Perez until she could receive the GI Bill stipend. According to Alhiwage's uncontradicted testimony at the show-cause hearing, the GI Bill stipend is paid at the end of each month of classes. Since she began classes in early May, she was supposed to receive the stipend in early June, and she testified that she had not yet received her stipend as of late June due to processing delays. Because Alhiwage did not receive the stipend in May, Perez owed her a payment for that month.

Perez's third argument — that Alhiwage declined spousal support after March 2017 — relies on an email that Alhiwage's counsel sent Perez on March 3, 2017. This email stated:

> I am writing to update you that Ms. Alhiwage has received confirmation that she will begin receiving the

GI stipend effective April 2017. This will limit Mr. Perez having to pay continued spousal support of $1200 per month effective April 1. I am confirming with this email that Ms. Alhiwage will not be seeking spousal support payments after March 2017.

Ten days later, however, Alhiwage's attorney sent a follow-up email stating that Alhiwage would in fact be seeking spousal support payments after March 2017 because she had learned that the educational program in which she had planned to enroll would not meet her needs. The program, as noted above, was part-time and would not allow Alhiwage to receive the full $3,400 GI Bill stipend.

Perez does not assert a legal basis for his argument that Alhiwage irrevocably declined spousal support or otherwise develop the argument. In particular, he does not explain how he relied to his detriment on Alhiwage's initial disavowal of spousal support, as would be required to establish estoppel.[14] Neither does he show that Alhiwage received consideration for her apparently unilateral concession, as would typically be required for a contract claim.[15] We therefore reject Perez's argument.

## C. The Superior Court Did Not Abuse Its Discretion In Denying Perez's Motion To Compel Alhiwage To Attend The Cortiva Institute For Massage Training.

Perez claims that the superior court erred in denying his "Motion to Enforce the Agreement that the 17 Months of the Post 9/11 GI Bill Was for the Purpose of

---

[14] *See Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984) ("The general elements of equitable estoppel are (1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice.").

[15] *See Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997) ("The formation of a valid contract requires an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound.").

Attendance at Cortiva Institute for Massage Training." But the superior court did not abuse its discretion in denying this motion.

The superior court correctly noted that the Final Order and Judgment "makes no mention of" the Cortiva Institute. And the court did not clearly err in finding that "it was never a material term of the [parties'] agreement that [Alhiwage] attend that school." Indeed, Perez testified at the show-cause hearing that he encouraged Alhiwage to enroll in institutions other than the Cortiva Institute: "[In January,] I said, go to any school. You can always transfer the GI benefits to another school. That was very clear."

Because Perez has not shown Alhiwage's attendance at the Cortiva Institute was a material condition to his performance, her failure to attend that school does not entitle him to partial rescission.[16] Even if there were some merit to Perez's contention that the parties agreed that Alhiwage would attend the Cortiva Institute, Perez did not show that he was entitled to relief. He did not show that Alhiwage's decision not to attend the Cortiva Institute deprived him of any benefit under the parties' agreement,[17] and he did not show why it would have been equitable to force Alhiwage to leave the college she had selected and enroll in the Cortiva Institute.[18]

---

[16] *See Estate of Lampert Through Thurston v. Estate of Lampert Through Stauffer*, 896 P.2d 214, 219 (Alaska 1995) ("If [wife's] actions were so material that they destroyed the 'essence' of the bargain, under contract law, [husband's] estate is entitled to rescission and restitution of benefits conferred.").

[17] *Cf. Alaska Constr. Equip., Inc. v. Star Trucking, Inc.*, 128 P.3d 164, 167 (Alaska 2006) ("The ordinary measure of damages in contract law . . . strives to give the benefit of the bargain to the non-breaching party.").

[18] *See Jameson v. Wurtz*, 396 P.2d 68, 74 (Alaska 1964) ("Specific performance of a contract is not a matter of right, but a question of equity . . . ." (quoting *Shull v. Welch*, 387 P.2d 606, 609 (Okla. 1963))); RESTATEMENT (SECOND) OF CONTRACTS § 364 (AM. LAW INST. 1981) (stating that specific performance "will be

(continued...)

**D.** **The Superior Court Did Not Abuse Its Discretion In Enforcing The Final Order And Judgment's Requirement That Perez Store Alhiwage's Belongings "For A Reasonable Period Of Time."**

In its order granting Alhiwage's Motion for Enforcement, the superior court ordered Perez to "safeguard [Alhiwage's] personal property" for "up to six months from" February 23, 2017. Later, at the June 21, 2017 show-cause proceeding, the court required Perez to hold Alhiwage's belongings for up to 60 days after he paid her the past-due spousal support. Perez claims that these requirements were inconsistent with paragraph 9 of the Final Order and Judgment, which required only that Perez store Alhiwage's property "for a reasonable period of time."

We conclude that the superior court did not abuse its discretion in enforcing paragraph 9. The Final Order and Judgment does not define "reasonable period of time." Generally, however, "[a] reasonable time is 'to be determined upon consideration of the subject matter of the contract, what was contemplated at the time the contract was made, and other surrounding circumstances.' "[19] "[W]hat constitutes a reasonable time is a question of fact for the trial court."[20]

At the February 15, 2017 hearing on Alhiwage's Motion for Enforcement, Perez conceded that Alhiwage's property did not take up a "significant amount of room" — only about four feet by four feet of floor space. Alhiwage lived out of state, and she indicated that she had limited financial means to retrieve the belongings given Perez's

---

[18] (...continued)
refused if such relief would be unfair because . . . the relief would cause unreasonable hardship or loss to the party in breach").

[19] *Laybourn v. City of Wasilla*, 362 P.3d 447, 459 (Alaska 2015) (quoting *Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1089 (Alaska 1985)).

[20] *Hall*, 695 P.2d at 1089.

failure to pay spousal support. These circumstances adequately support the court's implicit finding that six months after February 23, 2017, was a reasonable period of time for Perez to store Alhiwage's belongings.

As of the June 2017 show-cause hearing, Alhiwage had not received spousal support from Perez since December 2016, and she testified that she was facing substantial financial hardship. Perez did not present any evidence indicating he faced hardship as a result of storing Alhiwage's belongings. These circumstances adequately support the court's conclusion following the show-cause hearing that Alhiwage should have 60 days from when she received the spousal support payments to retrieve her belongings.

Perez cites AS 34.03.260(a), which provides that a landlord may dispose of a tenant's abandoned property under certain circumstances. But Perez does not explain why Alhiwage should be considered his tenant for purposes of this statute.[21] This statute has no applicability in this case.

## V. CONCLUSION

We AFFIRM the superior court's grant of Alhiwage's Motion for Enforcement, the court's ruling following the show-cause hearing, and the court's denial of Perez's Motion to Enforce.

---

[21] *See* AS 34.03.360(22) (defining "tenant" as "a person entitled under a rental agreement to occupy a dwelling unit to the exclusion of others").